Thank you and good morning. May it please the court, my name is Robert Sherlock. I am counsel for the Plaintiff Relator, Dr. David Vatan, in this case. This case arises out of the dismissal under Rule 9b and Rule 12b-6 of a Federal Faults Claims Act action. The case, in some cases, in some situations, in some ways, is a paradigmatic and straightforward Faults Claims Act case. It's a case of, in our view, an intentionally defectively created production line, if you will. The production, in this case, arises out of, as the court is undoubtedly aware, an Agent Orange related action that the Department of Veterans Affairs contracted with QTC to perform reviews on veterans' files from the Vietnam War era in two different batches of reviews. QTC was not to determine, at the end of the day, the entitlement to benefits, the entitlement to disability compensation arising out of changes in the definitions and extension of definitions of presumptive diseases under the Agent Orange and the Niebuhr 1 and 2 and the Niebuhr class settlements following the Vietnam War. Rather, what QTC was contracted and obligated to do was to review, in a first process, some 65,000 veterans' claims files to see if an earlier date of entitlement may apply. The second batch was necessitated by a redefinition of one of the Agent Orange presumptive diseases, namely peripheral neuropathy. That definition necessitated the re-review of some 95,000 veterans' files to determine. The plaintiff for later in this case, his medical doctor, who was working as a claims file analyst for QTC, had observed in the course of his employment and the material that was given to the claims file analysts. Now, let me back up a bit. The job of QTC was simply to do an initial screening to see if that claim file contained any medical evidence that met certain definitions in order to mark those on a form that the Veterans Administration provided. To send to the VA as a yes, you need to look further at this for potential benefits. Or, no, there's nothing in this file, send it back to the regional office and put it on a shelf. That's the end result of the process. So while there's an assembly line process, if you will, that assembly line, the product of that was a review of these files. What Dr. Vatan observed and what the second amended complaint in this case more than adequately details is this is a case of a systematically sped up or defective, quote, unquote, production line. That is the sole reward in this case or the sole process variable was speed of reviewing the files. The evidence in the case, the complaint details that QTC was paid on a per file completed basis by the VA. So much for a file under a certain size, more for a really thick Veterans file, some of which contain 2,500 pages of medical records. The claims file analysts were paid on an hourly basis. After claims file analysts reviewed this to go through and find what's in the record, it was passed to a licensed medical doctor for a signature constituting a qualified medical opinion that, yes, there's something here, no, there isn't, and then send it to the VA adjudicators or not. In the case of the medical doctors, they were paid per signature. They were paid $25 for every file they signed. This is a system designed to be rewarded on the basis of speed and volume, not accuracy. The issue in this... Well, Dr. Vatan was paid $25 or was he paid on an hourly basis? The doctors were paid per signature. He was paid per signature? Paid per form signed. And who was paid on an hourly basis? The claims file analysts back up the process who looked through the files, and the pressure from management as evidenced in the complaint was, we're not getting enough done, we're not getting enough done, you need to do 300. Some of the claims file analysts in an eight-hour shift were purporting to review 60 of these files. But they were paid on an hourly basis? They were paid hourly, correct. Regardless of how many files they reviewed, they would make the same amount of income, right? Correct. So they had no particular incentive to do anything here to speed up the process, did they? They had incentive from management publishing the statistics and creating workplace pressure to not fall behind. The economic, you know, incentive was Dr. Vatan, the ones who were getting $25 per review, right? Correct. The doctors were paid $25 for each sheet they signed. Now, this is a case of whether or not, in this de novo review, obviously, the complaint with the examples in it that Dr. Vatan provided meets pleading standards under 9B and 12B6. Ironically, in the course of this process, when the 95,000 files came back around for a second review, some of those had also been reviewed previously in the first review for ischemic heart disease, Parkinson's disease, and B-cell leukemia. Dr. Vatan was able to then see some QTC review sheets that had been done previously, and from his knowledge as a medical doctor, looking at those and seeing whether or not the file contained such evidence that was denied in the first case. What was his own experience personally? Were his files being denied, or was there anything untold that was happening with the files that he reviewed? Well, the files that he reviewed, he was probably the slowest person in the claims file analyst group because he was the most thorough. But what he saw in those re-review sheets were affirmatively false statements, affirmative statements saying there is no evidence in the record, missing actual reviews and actual medical records from a VA hospital. I'm sorry, sir. You get access to other people's reviews. I mean, we know what he did, but how did he know about what other folks did? He knows what other folks did from those re-review sheets. What were these re-review sheets? He had access to them? Excuse me? He had access to these sheets? Only, no, not as they went out. Only with those files that came back in the second review that had a sheet in it from the first review because it was the same veteran. Did he review those files? How many did he review himself? Of those files, of the files. I just want to get a sense of how he had knowledge of what was happening. His knowledge of what was happening was watching it in the workplace, was seeing that the knowledge of what was happening was his watching it in the workplace, his seeing how fast other people were doing things, his seeing mistakes that doctors were making. They're detailed in the complaint. For example, files where the review sheet, the review sheet that was actually filled out, that had very specific questions in it, were mixed up in the file. Somebody got them all mixed up and were handed over. The doctors signed them anyway, not noticing that the review sheet didn't even match the file they were signing. 185 charts being sent back to QTC from the VA where the forms were not even filled out and they had been sent back. Did he look at all those? I'm just not clear about how he educated himself about what was happening. I understand that he did things and he knows about what he did. He was slow, whatever it was, but how did he find out about what these other people were doing? He was there, what, for three months? No, he worked there for over a year. A little over a year. So I just want to find out how he knew what everybody else was doing in addition to what he observed personally in the workplace. He could tell the examples of falsity that he has are those sheets that came back around. And he looked at those? Yes. He had access to those? He had access to those because they were already in the file that came back. And he said, oh, here in the original project, these 9, 10, 11 reviews were done that said X. I'm going to go back and see if X is true. And X was not true. And there were affirmative statements on those, not just no evidence, an affirmative medical statement saying there's no evidence in the file of this condition, this condition, this condition, missing voluminous records, some from the VA itself of this condition, this condition, and this condition. But the files that were returned, somehow he was able to review those files. Yes, they were randomly assigned to him. They were randomly assigned to him. So he didn't have everything everybody did. But he had a sample. He actually had samples because they were returned and they were randomly assigned to him as well as to others. Yes. And that's when he picked up what he thought was going on. When he saw those. In addition, at the outset of the process, QTC gave the claims file analysts a document they produced, and that's in the excerpts of record, QTC's review process, that affirmatively contradicted a manual produced by the VA, that is also in the excerpts of record, saying, you know, NEMR review for QTC. That document was not given to the claims file analysts. I'm just curious. Procedurally, if we were to agree and say that this was not a proper disposition by the district court, this would then open up to massive discovery, I take it, on the part of the relator, right? Well, it would open up, depending on the nature, it could open up some discovery issues. It could also be done by sampling of the files because they're all recorded. Disposition A, go back to the VA. Disposition B, go to further review. That could be done by sampling, and that would be a separate issue for discovery management by the district court. You may have to get experts to work along with you, I guess, and things like that. We would have to get experts, yes. The plaintiff or relator would have to get experts. Statistical sampling experts and things of that nature. Excuse me, sir? Statistical experts who can look at statistical samplings and give their professional opinions about them. I mean, that would be how the process would unfold, I guess. That would be the discovery process that would have to unfold. In order, what this is, simply put, this is a case of a process that set up false negatives. In other words, you have a process where it's fast to say no and send it back to the VA where eyes will not see it again. It's slower to say yes and send it this direction. The problem is what a false negative is. Excuse me? Yes, they were paid for every file they reviewed. So the ones that were fast went no. They simply went back to the regional office. That's the falsity. And the claim was sent through falsely saying that they had completed the review process they were obligated to do. That's the process. I have about a minute and 14 seconds left. I'd like to reserve that for reply, if I could. We'll give you two minutes, Roberto. Okay. Thank you. Good morning, Your Honors. May it please the Court. I'm Mark Troy for the defendant QTC. I just want to first correct a misstatement in what counsel said. The plaintiff was a claims file analyst. He was not a physician doctor reviewer. So he was not paid the $25 per signature. He calls him a doctor. He went to medical school, I believe, but he's not a licensed physician in the U.S. So he was not in the $25 per signature thing. He was one of the claims file analysts. He just paid a straight salary. Correct. Correct. And that's in the excerpt of Record 24. It's in the complaint. I think it was just a misstatement. That's what I understood from the previous argument. But now, what he's got here is his personal belief that QTC performed poorly. That's it. There's no contract requirement noted anywhere in the record for any of what the plaintiff is complaining about. That's the problem is I see it. There's no contract because you did not furnish the contract. The contract was in your sole possession. I think you did submit snippets or parts of the contract to support, you know, your thesis. But where is the contract? He doesn't have the contract. Well, he doesn't. And the False Claims Act is for whistleblowing insiders. Well, he's an insider. He has personal knowledge. He was there for apparently over a year. He knows specifically what was happening, what was not happening. He has the best knowledge of all, his own personal observations, his own personal experiences. And so he should not be able to go forward because you hide the ball from him and don't produce the contract.  Well, it's not hiding the ball, Your Honor. The piece of the contract he alleged, he alleged a contract requirement and by doing it. Have you given the contract? No. What we provided the district court, which we're allowed to do, if he says some piece of the contract and describes it, then we can include in the record that piece of the contract. But wouldn't your case have been stronger if you just supplied the entire contract? Then you could have pointed out where in the contract, you know, this was not required? I mean, why didn't you do that? This is, well, first of all, we provided the relevant pieces. The things that he says are required simply aren't in the contract. I haven't seen the contract. How do we know that? Well, it's his job to point it out as a whistleblowing insider. How does he do that? I mean, I just am curious. I understand he's a whistleblower. He's not a favored employee. I get that. But how does he produce a contract which is in your sole possession and you're not voluntarily giving it to him? Producing the contract isn't required in all cases, and it's not required here. And the fact that he doesn't have the contract isn't a flaw. How do we know it's required if we don't see the contract? Maybe I'm being naive. I can give you an example. I have these cases all the time. If an employee of a company works with a group of people and they're required to perform a test, and everybody is performing the test, and as the part goes down the assembly line, they perform a test on it, if a guy sees the guy next to him skip the test, he just witnesses with his own eyes, he's skipping the test, then he has seen a fraud occur. What the plaintiff here is seeing is nothing. He's seeing people work more quickly than he's working. That's all he's seeing. And from that observation, he is guessing that, well, there must have been a requirement having to do with the pace of the review. I'm a medically trained. I went to medical school. These other people next to me. He's saying that there must be a requirement somewhere that files be reviewed, and he thinks that from what he has seen, he says, some files weren't reviewed and the company presumably got paid by the government. It's all a presumption. It's lacking in specifics at every step of the way, including, as I was saying, the observation that a wrong conclusion is being made on purpose. There is no evidence of that. The examples that he cites are incomplete. They are not even errors. One might be an error, but that's the best that could be said about it. But they're incomplete in the following ways. He says that a claims file analyst reviewed 30 in one day, and according to a performance statistic sheet, maybe that person worked overtime. Maybe it was really easy to review the file. As the record reflects, as we say in our brief, some of these files are quite large, but the determination can be made in a minute or two, because what you're looking for and the other sort of mischaracterization of the plaintiff's case is that these were supposed to be medical diagnoses. This process, including the checklist, is not to have a doctor or a claims file analyst make a new diagnosis. It's to look at the record in the first phase. It's just to look for dates. Was there a claim? Was there already a diagnosis? That was the purpose. And then in the second phase, then they were looking for more information, but his examples all are about the first phase. As he said, in the second phase, when files came back to the CFAs to look for the new condition, he looked at the old condition stuff, and he came up with six examples. Those are the things with the initials of the veterans. In every one of those situations, there's an essential piece missing. So, for example, in the one for J.R.M. at Excerpt of Record 59, the TAN says there's evidence that in 1981, the veteran had cardiovascular problems and chest pain, yet the checklist said that there was no medical evidence of coronary heart disease prior to 2006. But that's not evidence that there was a cardiac condition between 1985 and 2006. And there also was no evidence, as alleged in Vitanne's allegation in the complaint, he's not alleging that that veteran filed a claim for a cardiac condition between those years, and that's required for eligibility. So each one of these examples we describe in our brief, why they are wholly incomplete. This is a case where it's a search for an unknown wrong by someone who was inside enough to be upset about things, but not informed enough to be a reliable whistleblower. The who, what, when, where is all missing. Who is a few names of people. Somebody rearranged the workspaces. Somebody distributed productivity statistics. The contract and its incentives for how to do the contract was written by the VA. The purpose of rule. Why is it such a big secret, then? Pardon? Why is it such a big secret? The contract?  I'm sorry, I'm not characterizing it as a secret. At that stage of pleading, we're not even really supposed to put in anything outside the complaint. We put in the one thing because he referenced it, and it was just, and you're allowed to do that. But it's his job as a key TAM whistleblower who wants to haul this company into court to defend and make no uncertain about it. He wants all 160,000 files re-reviewed. We don't even have those files anymore. They're at the VA. Didn't the district judge dismiss things in part at least because there was no contract in evidence? The district court opinion noted that the plaintiff could not allege what the contract requirements were. That he appeared from his complaint to be making things up as he goes along about qualifications, about training. Nothing is cited by the plaintiff. These are all on their face, made-up allegations, and that's how it appeared to the district judge. The plaintiff said that this was based on the bid. He's not saying that. That his understanding of what the contract was was based on what contract was requested. No, he's not saying that, and he doesn't have the bid either. He's not citing that either. So is the contract now publicly available? I don't know. You don't know? No. You don't know whether if you Google it, you can find the contract? I don't think this contract is publicly available, but I'm not sure. You don't know that it can be found on Google? I don't know. Rule 9b is to prevent this type of speculative pleading and, in part, to prevent a burden, not just on the defendant, but this burden is going to fall on the Veterans Administration because they have all the records, and the government declined this case, yet they're the ones who are going to be having to do a lot of work if this case goes forward. With regard to the speed and the pace of the work, again, there is no, he's not citing, and there is no requirement to go at a certain pace. The checklist, and this is really what influenced the district court to dismiss the case, this case began with the plaintiff saying, ah, the checklist, there's this checklist, I've got it because I was a worker there. The checklist is the scheme. Using the checklist is the way of short-cutting what the company was supposed to do. It's the checklist that's the bad thing. And that was, in our first motion, we took the liberty of saying, well, here's the checklist, and it shows that it was the VA's checklist. That was the requirement. So his second amended complaint says, oh, okay, well, it's not, so it must not be the checklist that's the fraud, it's, let's see, the checklist wasn't filled out properly because everybody around me went too fast. That's why it was so apparent to the district judge that he could not make a proper allegation of all of the necessary aspects of what the fraud is. And, you know, Judge Reinhardt, your decision, you were on the panel in Swobin v. UnitedHealthcare. It's an interesting 9B case because part of it was found to be acceptable with regard to some of the defendants, but allegations with regard to the other defendants did not meet 9B. And if you go back and look at that decision, the statements that the court made about the inadequate pleading are verbatim what you could say about this case. So he says other things here. He contends that there's no standardized or substantive training for reviewers on what to look for in the files. There's no VA-provided resources for the reviewers, no review process for the quality or accuracy of the screening, and no random review department to assure quality. And it may well be that this contract may say a lot about that and what was supposed to do happen and what did not happen. And it seems to me from a pleading point of view, you could have attached the contract as referenced in the 56 pages of the complaint here. You certainly could have attached that. I think it's permissible from a pleading point of view to do that. Not required to. And really, I believe that when you are walking into court on... It may not be required to, but that may be the problem with your case. I really fail to see how the problem with my case is that I didn't give him... I, representing the defendant, didn't hand him a bunch of information that could help him. He illicitly creates an odor here. Would you acknowledge that? I'm sorry, Your Honor. I can't acknowledge that. I know what key TAM cases are about, and in order to haul a defendant in purportedly on behalf of the United States government, this company's primary customer, you've got to have something. And that's what the Ninth Circuit says. That's what all of the courts say. It's what the Supreme Court says about, in Escobar, when it talks about the materiality standard. It's a big distinction between somebody complaining about lousy performance and somebody standing up in federal court saying, government, your contractor cheated you. You've got to have a lot of information to come in there, and it's not the defendant's job to hand him anything. Any other questions for me? I'll submit on that. Thank you, Counselor. What do you say about all that, Counselor? Where do I exactly go? I begin. First of all, the fact that the defendant... Excuse me, before I didn't slip. First of all, I would like to clarify, I did mishear the question when you asked about Dr. Vitan's role. He was claims file analyst and was paid hourly. I misheard the question. And thank you for clarifying that, Mark. The argument posits that the only way that a Cuitam relator can know what is required of a contractor for the government is to have the contract. And that is not true. Multiple documents referenced, cited, and attached both in the excerpts of record and in the complaint, including the Veterans Administration's own guidance to QTC, which I reiterate was not provided to the workers on the line, detailed what those were. In that document, very briefly, the entire claims folder should be reviewed to ensure the documents in the file are in chronological order and then the volumes with evidence or correspondence dated September 25, 1985 to the present must be thoroughly reviewed to determine if there's a potential basis for entitlement to judicial benefits. That's in a document that the relator had. Why were there successive complaints? Because at each step following the unsealing, the relator was able and we were able to develop more evidence and information specifically to fill in that gap, the fact that they didn't have the contract. Now, question. Is the contract publicly available? To be perfectly honest with the court, as I would be nothing but, this case has attracted media attention. The media stories, both in Sinclair Broadcasting and Apache Newspapers, the reporters sought out those through FOIA requests and those were available as attachments to those. We did not have that. Nor could we make a FOIA request or run afoul of the government report public disclosure issue. Another question, very simply. For example... How do you amend your complaint now to attach the contract? I mean, is that what you want us to allow you to do? We would amend the complaint to determine any pleading, to fix any pleading issues that we could perceive. We don't perceive there are any right now. Your complaint is fine the way it is. You don't need any amendment. Excuse me? Sorry. You think your complaint is fine the way it is. You don't need to have the opportunity to amend it. Since the trial court did not point out any pleading deficiencies, what I pointed out was evidence deficiencies. And my esteemed opponent does not argue a sufficiency of pleading in his talking about, oh, there's alternate explanations for everything. That's an issue of evidence, not an issue of pleading. We're at an initial pleading stage. And the complaint articulates who, what, when, where, and how, and additionally articulates why for a false claims case. This case was dismissed because, in essence, the trial court believed, since we didn't have the contract, we couldn't articulate anything wrong. And since we didn't have the contract, there's no point amending because you don't have the contract. And the selective attachment, none of the contracts, despite the declarations from QTC to that effect, articulating saying this is the contract when what is actually attached is the signature cover sheet of the government contract, not the deliverables. That's where we are. Thank you. Thank you very much. Thank you both. It's argued we'll be submitting.
judges: Canby, Reinhardt, Block